UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

ANDREW G. GIELDA,

          Plaintiff,

                                   Case Number 10-12534-BC
v.                                    Honorable Thomas L. Ludington

BANGOR TOWNSHIP SCHOOLS,

          Defendant.
_____/

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DISMISSING PLAINTIFF'S COMPLAINT WITH PREJUDICE

On June 25, 2010, Plaintiff Andrew G. Gielda filed a three-count complaint against Defendant Bangor Township Schools, alleging that his employment as a school principal was ended because of his gender in violation of the Michigan Elliott-Larsen Civil Rights Act ("ELCRA"), Mich. Comp. Laws §§ 37.2101–.2804, and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e. He further contends that the decision was based, in part, on his participation in labor union activities in violation of the Michigan Public Employment Relations Act ("PERA"), Mich. Comp. Laws §§ 423.201–.287, and the Taft-Hartley Act or the Labor Management Relations Act of 1947, 29 U.S.C. §§ 401–531. Plaintiff also contends that the decisions violated the Michigan "Administrator's Due Process Act," Mich. Comp. Laws § 380.1229.

On April 22, 2011, Defendant filed a motion for summary judgment contending that all of Plaintiff's claims should be dismissed. Defendant contends the Title VII and ELCRA claims should be dismissed because there is no causal connection between Plaintiff's gender and the decision to not renew his contract. Defendant further contends that there were many legitimate, nondiscriminatory reasons for the decision. Defendant further contends that Plaintiff's claims based

on PERA and the Taft-Hartley Act should be dismissed because the decision to not renew the contract was independent of Plaintiff's union activities, and that the school district complied with Michigan laws governing school administrators' contracts.

On May 20, 2011, Plaintiff filed a response raising what he contends are numerous issues of material fact that prevent summary judgment. Indeed, the parties versions of the events leading up to the challenged decision are often starkly different. Nevertheless, when focused on the key issue, causation, Plaintiff has not presented sufficient evidence to suggest that his gender or his participation in union activities caused or even contributed to the school board's decision not to renew his contract. Accordingly, Defendant's motion for summary judgment will be granted, and Plaintiff's claims will be dismissed with prejudice. The hearing scheduled for July 11, 2011 was canceled based on the Court's determination that the parties papers provide the necessary information to resolve the motion. *See* E.D. Mich. L.R. 7.1(f)(2).

**I.**

Plaintiff worked for the Standish Sterling Community Schools from 1997 through 2007. He was hired by Defendant to fill an open principal position at the Christa McAuliffe Middle School for the 2007 through 2008 school year. The hiring decision was made by the school board, upon the recommendation of a hiring committee, which was composed of Tina Kerr, the superintendent, Richard Heinrich, the assistant superintendent, Shawn Bishop, the curriculum director, and unidentified teachers.

Beth Robb was hired at the same time as Plaintiff to serve as principal of the high school. Because Robb was hired as the high school principal and Plaintiff as the middle school principal,

Robb received a higher salary than Plaintiff even though she had less experience than Plaintiff. Pl.'s Dep. at 37.

Kerr was actively engaged with the teachers at Christa McAuliffe Middle School after Plaintiff was hired as the principal. Kerr met with teachers individually, and also held regular "snack and chat" meetings with groups of teachers. *Id.* at 74. Plaintiff testified during his deposition that the middle school was the only school in the district where Kerr held "individual snack and chats" and used them as "an evaluation tool." *Id.* at 75. Kerr would meet with staff, sometimes individually, and then report back to Plaintiff concerning the staff members' complaints. *Id.* at 75–76. No other principal, according to Plaintiff, received such scrutiny. Kerr, however, disagreed. Kerr testified that she had "far more" meetings with Robb's staff than with Plaintiff's staff. Kerr. Dep. at 57–58.

Plaintiff also contends that an unknown woman on the staff at the middle school circulated a survey concerning Plaintiff's performance to the other women on the staff. Pl.'s Dep. at 86. He contends that the survey results were shared with Kerr, and that Kerr met with a group of women on the staff at the end of the school year to discuss Plaintiff's performance. *Id.* According to Plaintiff, Kerr referred to the group of women she met with at the end of the year as her "gang." *Id.* A secretary in the central administrative office, Cara Lee Barcia, testified that there was "gossip" in the district about the survey and that it did not reach all the staff members at the school. Barcia Dep. at 36–37. Kerr knew that an "informal survey" was being distributed, but she did not have anything to do with it. Kerr Dep. at 57–58. She testified that "[i]t was none of my business." *Id.* at 58.

Kerr frequently received calls from teachers complaining about Plaintiff's performance as a principal. Pl.'s Resp. at 3; Barcia Dep. at 67–69; Pl.'s Dep. at 86. Such calls from teachers to the superintendent were unusual. Barcia Dep. at 67. Kerr kept a "notebook" where she recorded her communications with staff about Plaintiff. *Id.* at 51. Kerr testified concerning the nature of the staff's complaints, indicating that Plaintiff was reluctant to become involved in disciplining students and frequently resorted to suspensions. Kerr. Dep. at 20–21. She further explained the teachers' concerns:

> I had numerous complaints from staff that when they would come to his office to try and communicate with him he would physically turn his back to them, wouldn't look up from his computer. He did not do a staff letter to introduce himself to the staff. The person that we interviewed and the person that showed up the first day were two totally different people.
> We interviewed somebody who was very energetic, very excited, wanted to be there. The person that showed up appeared to be very much on a power trip, this is how it's going to be, this is my way or no way, and immediately within the first two weeks of school, I began receiving staff complaints about [Plaintiff] and his treatment.

*Id.* at 21. Kerr also testified that she was concerned about Plaintiff's visibility at the school during the day, and at middle school athletic events after school hours. *Id.* at 16. Kerr testified that board members approached her, concerned that the principal's office at the middle school was always dark even though students and other staff members remained in the building. *Id.* Plaintiff also did not attend events at the middle school, such as athletic competitions. *Id.*

Richard Heinrich, then-assistant superintendent in the district, also testified that he was aware of complaints by staff about Plaintiff's performance. Heinrich Dep. at 10–12. Heinrich testified that there were complaints about Plaintiff's leadership, his interest in the staff, and his communication with the staff. *Id.* Heinrich testified that while an isolated comment about

-4-

Plaintiff's leadership skills would not be a substantial concern, because of the trend of similar comments he was concerned about the situation at the middle school. *Id.*

On October 10 and 12, 2007, Plaintiff participated in union negotiations with the district at the request of other administrators. Pl.'s Dep. at 270. The administrators negotiated an annuity as part of their compensation package, Kerr presented the package to the board, and it was approved. *Id.* Plaintiff, however, was not entitled to receive the annuity because he had only worked for the district for two months. *Id.*; [Dkt. # 17-4]. During her presentation to the board two years later, recommending that Plaintiff's contract not be renewed, Kerr indicated that Plaintiff was hostile during the negotiations when he learned he would not receive the annuity. [Dkt. # 17-4]. Kerr told the board:

> On October 10th and 12th, I met with the USW (Admin) team to discuss negotiations. Mr. Gielda volunteered to be a representative for the administrative team. These negotiations were tenuous due to Mr. Gielda's own agenda. He insisted that he should be eligible for the 2007–08 increase and annuity payment. This created some hostility between the team, as well as they felt Mr. Gielda as well as I did that Mr. Gielda should not [be] eligible for a pay raise after only being on the job for two months. His salary and contract w[ere] adjusted in July when he began his employment with the district. He still held firm that he thought he should have had the raise, but the administrative team ignored his own agenda and voted to approve the new contract.

[Dkt. # 17-4 at 9].

On March 25, 2008, Kerr completed a STAGES evaluation of Plaintiff's performance up to that time, and concluded that he was performing below expectations. [Dkt. # 17-9]. Kerr concluded Plaintiff was performing at a "proficient level," the level expected, in only forty-four percent of the evaluation categories. She concluded he was performing at an "introductory level," below the expected level, in fifty-six percent of the categories. The STAGES evaluation included a three-page "individual development plan," providing detailed suggestions from Kerr on how Plaintiff could

improve his performance to reach the proficient level. Plaintiff does not recall receiving the individual development plan. Pl.'s Dep. at 25–26. He testified that "I did ask for an improvement plan from Dr. Kerr and she said I did not need one at the time." *Id.* Kerr, on the other hand, testified that the individual development plan was automatically generated by the STAGES software anytime an employee was rated below the expected level in any category and that the plan is shared with the employee during the evaluation. Kerr Dep. at 27–29. Plaintiff's own self-evaluation for the same period was substantially stronger. He rated his performance as "exemplary" in fifty-six percent of the categories, and proficient in the remaining forty-four percent of the categories.

Plaintiff identified one incident with a teacher at the middle school that occurred during his first year that made him believe Kerr was hostile toward men. A teacher on the staff named Jennifer Gradowski told Plaintiff that "no man will tell her what to do . . . and that she knows what a relationship is with Dr. Kerr and what she can do." Pl. Dep. at 97. Gradowski had approached Plaintiff to discuss a conflict she was having with another teacher, Ken Hoard, and her comment was made in the context of that conversation. *Id.* at 141–42. Plaintiff told Kerr about the comment, but Kerr did not take any action. *Id.* at 130.

At the end of the school year, Kerr decided to move Plaintiff to the elementary school and move Diana Tuttle, the elementary principal, to the middle school. Kerr. Dep. at 26. Plaintiff did not want to move, but he was told by Kerr and Heinrich "to lie through my teeth and make this my decision, that I wanted this move and don't believe the rumors that were going around that they had taken Diana Tuttle out and whipped her into taking" the middle school. Pl. Dep at 186. Despite his reservations, Plaintiff agreed to the move. Kerr explained her reasons for the move during her deposition:

-6-

I wanted to give him another opportunity to be successful. This thing is very clear to me, this was my first Principal hire as a new Superintendent. His success was very dependent on my success. I wanted him to be successful. So I felt I needed to give him every opportunity to do that.

There were so many severed relationships at the middle school that in Andy's defense, I don't believe he would have been given a fair shot in that position to continue, which is what resulted in me strongly suggesting he move to the elementary school.

Kerr Dep. at 26.

Plaintiff testified that during the meeting where the switch was announced, Kerr stated "[W]here is my gang[?]  If they don't show up, I'll be pissed."  Pl. Dep. at 186.  Plaintiff testified that Kerr was referring to the group of women on the staff who had helped organize the survey and wanted Plaintiff removed from the middle school.  *Id.* at 186–87.

In Defendant's view, Plaintiff's performance did not improve the following year after he was transferred to the elementary school.  Def.'s Mot. at 8–9.  Indeed, Defendant contends Plaintiff's performance continued to decline.  In Plaintiff's view, the harassment based on his gender escalated, as Kerr tried to "build a file" to justify Plaintiff's termination.  Pl.'s Mot. at 5–8.

Plaintiff contends that Kerr recruited two teachers at the elementary school to be her "eyes and ears" at the school and report back to Kerr about Plaintiff's performance.  Pl. Dep. at 208–10.  The teachers were both women, Couri Conzelmann and Michelle Goallie.  *Id.*  Plaintiff also contends that he was assigned a specific parking spot at the elementary school.  *Id.* at 249–51.  A custodian at the school named Ray Winchell explained to Plaintiff that the principal of the school traditionally parked in the same spot "so that it was easy to know if the principal was in the building."  *Id.*  Plaintiff was later asked to give up the spot, however, when Michelle Goallie became pregnant.  *Id.*  Penny Berger, another teacher, informed Plaintiff that the principal would often give up the spot if one of the teachers developed a health-related need that made parking closer to the

school building important.  *Id.*  At some point, Heinrich also spoke with Plaintiff about the parking

spot, asking him to give it to Goallie and then hold a raffle for the spot for the rest of the year,

because the administration was receiving calls about the parking-spot "controversy."  *Id.*

Kerr contends that Plaintiff's performance did not improve following the move to the

elementary school.  Kerr. Dep. at 29–30.  She began the year by talking with Plaintiff about ways

he could work more "collaboratively" with the teachers, but the discussions were not helpful.  *Id.*

> By February, it was apparent he was not making any changes.  He was operating
> under the same status quo as he had at the middle school and things started to
> deteriorate as well. So I sat with him again and gave him another plan that was more
> specific with actual items outlined of things he could do to improve.

*Id.*  Kerr also noted that Plaintiff's apparent problems with student discipline also were not

improving.  Plaintiff suspended 132 elementary students that year, compared to twenty-seven and

eleven at the other two elementary schools in the district.  [Dkt. # 17-4 at 16].

Kerr's STAGES evaluation, dated February 4, 2009, reflected that Plaintiff was proficient

in forty percent of the categories and at an introductory level in the remaining sixty percent of the

categories.  [Dkt. # 17-16].  Plaintiff was also provided a detailed "individual improvement plan"

outlining a plan for improving his performance.  The individual improvement plan featured a

different format than the automatically-generated individual development plan he received the

previous year.  Kerr provided Plaintiff an amended improvement plan at a March 13, 2009 meeting.

At the same March 13, 2009 meeting, Kerr told Plaintiff that she was going to recommend

to the board that his contract not be renewed for the following school year.  Pl. Dep. 240–41.  Kerr

offered Plaintiff two options: (1) Plaintiff could resign and she and Heinrich would both provide a

letter of recommendation; (2) he could remain in his position and she would recommend that the

board not renew his contract.  Barcia heard Kerr say that Plaintiff would not receive the

recommendations unless he resigned.  Barcia Dep. at 17.  Additionally, Kerr asked Barcia to delete a positive evaluation from the STAGES system if Plaintiff refused to resign.  *Id.* at 17–18.

Robb, the high school principal who was hired at the same time Plaintiff was hired received the same offer as Plaintiff.  Unlike Plaintiff, Robb elected to resign and apparently received a positive evaluation and letters of recommendation from Kerr and Heinrich.

On April 23, 2009, the board held a special meeting where members of the community were offered an opportunity to comment on Plaintiff's performance, Plaintiff was offered an opportunity to speak on his own behalf, and Kerr gave a lengthy presentation outlining Plaintiff's performance problems and recommending that the board not renew his contract.  [Dkt. # 4].  The board voted unanimously not to renew Plaintiff's contract.  Plaintiff's was replaced by Margy Dewey, a woman.

## II.

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party has the initial burden of informing the Court of the basis for its motion, and identifying where to look in the record for relevant facts "which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the opposing party who must "set out specific facts showing a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted).  If the opposing party does not raise a genuine issue of fact and the record indicates the moving party is entitled to judgment as a matter of law, the court shall grant summary judgment.  *Id.* at 250.

The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. The party opposing the motion may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

### III.

Defendant contends that Plaintiff's discrimination claims should be dismissed because he cannot demonstrate a causal connection between his gender and the decision to not renew his contract. Both parties agree that Plaintiff's claims should be considered under the *McDonnell Douglas Corp. v. Green* burden-shifting framework. 411 U.S. 792, 802–03 (1973).

To demonstrate a prima facie case of employment discrimination under Title VII and ELCRA,[1] Plaintiff must show that he is a member of a protected class, he was subject to an adverse employment action, he was qualified for his position, and a comparable person outside of his class was treated more favorably or that he was replaced by someone outside the protected class. *White*

---

[1]Michigan courts frequently look to Title VII case law for guidance in applying ELCRA. *Plumb v. Abbott Labs.*, 60 F.Supp.2d 642 (E.D.Mich.1999). Neither party has suggested that a material difference in the statutes would lead to different results in this case. Accordingly, the Court will consider the claims together, focusing on federal case law.

*v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008); *Vaughn v. Watkins Motor Lines, Inc.*, 291 F.3d 900, 906 (6th Cir. 2002).

The parties apparently agree that Plaintiff is a member of a protected class, that he was subject to an adverse employment action when his contract was not renewed, and that he is qualified for the principal position. They disagree, however, about whether similarly situated women were treated more favorably that him. Defendant claims Robb was similarly situated, and that Robb was treated the same as Plaintiff. Plaintiff claims, without offering any evidence, that Robb was not subject to the level of scrutiny or harassment that Plaintiff was. Either way, because Plaintiff was replaced by a women, he has demonstrated a prima facie case of sex discrimination under the applicable Sixth Circuit test. *See White*, 533 F.3d at 391.

Where a plaintiff can demonstrate a prima facie case of discrimination under Title VII and ELCRA, the burden shifts to the defendant to "offer evidence of a legitimate, non-discriminatory reason for the adverse employment action." *Id.* (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 at 253 (1981); *McDonnell Douglas*, 411 U.S. at 802). If a defendant is able to offer a legitimate reason for its decision, "the burden shifts back to the plaintiff to show that the defendant's proffered reason was not its true reason, but merely a pretext for discrimination." *White*, 533 F.3d at 391–92 (citing *Burdine*, 450 U.S. at 253) (additional citation omitted). "Although the burdens of production shift, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.*

Here, Defendant has offered a legitimate, nondiscriminatory reason for its decision not to renew Plaintiff's contract, namely, his job performance. Plaintiff was not "visible" at the schools because he did not attend school events and often left his office early for personal reasons. Plaintiff

-11-

was the subject of numerous complaints from staff about communication and leadership skills. Plaintiff handled discipline at the schools poorly, overusing suspensions and disrupting the time available for classroom instruction.

Accordingly, the burden shifts back to Plaintiff to demonstrate that Defendant's proffered reason for the nonrenewal is not the real reason, but merely a pretext for discrimination. Plaintiff can demonstrate pretext by establishing that Defendant's proffered reason: "(1) has no basis in fact; (2) did not actually motivate Plaintiff's termination; or (3) was insufficient to warrant Plaintiff's termination." *Abdulnour v. Campbell Soup Supply Co.*, 502 F.3d 496, 502 (6th Cir. 2007) (citation omitted). Plaintiff does not challenge the factual basis underlying Defendant's proffered reason for the decision. Rather, he focuses on the second method, contending that the alleged performance problems did not actually motivate the decision not to renew his contract.

Plaintiff first emphasizes that Kerr did not provide assistance when he informed her that Gradowski made a "sexist" comment in front of him and that a group of women teachers were circulating a survey about him. One might be critical of Gradowski's comment that a man could not tell her what to do, but it does not demonstrate that the board's decision not to renew Plaintiff's contract was based on his gender. Indeed, Plaintiff's apparent reliance on Kerr to discuss the comment with Gradowski is symptomatic of Plaintiff's leadership and communication problems. An isolated inappropriate comment by a principal's subordinate teacher should not require the involvement of the superintendent of the school system.[2]

---

[2] Ironically, Plaintiff also contends that Kerr was too involved and communicative with the teachers in his school. When Kerr did meet with the teachers for so-called snack and chats, she was undermining Plaintiff's ability to lead. Pl.'s Mot. at 13.

-12-

Similarly, Kerr and the board had nothing to do with the survey.  The fact that it was primarily women who participated does not necessarily mean their participation was motivated by their supervisor's gender.  More importantly, it certainly does not mean that the decision not to renew his contract, made by an elected, independent board at the recommendation of the superintendent, was motivated by his gender.

Plaintiff also contends that Barcia's testimony demonstrates that the proffered reason for the nonrenewal was pretextual.  Specifically, Plaintiff notes that, according to Barcia, Kerr recorded her communications with Plaintiff in a notebook and asked Barcia to delete a positive evaluation of Plaintiff from STAGES.  Plaintiff does not explain why recording their communications in a notebook is evidence of discrimination.  Moreover, while creating and then deleting a positive evaluation of Plaintiff's performance in an attempt to force him to resign may be a bad management decision, it does not demonstrate that Kerr's actual motivation for recommending a nonrenewal of Plaintiff's contract was his gender.  Kerr offered Plaintiff an opportunity to resign with letters of recommendation and a positive evaluation in an attempt to avoid a contested vote before the board, and ultimately, this litigation.  In retrospect, her offer may have been disingenuous, but there is no evidence the decision was motivated by Plaintiff's gender.  The exact same approach was used in an attempt to force Robb, a woman, to resign.  And it was successful.

Plaintiff also contends that he was provided with an improvement plan for the first time eleven days before he was informed his contract would not be renewed.  Plaintiff contends that the timing demonstrates that Kerr did not actually want the alleged performance problems to be resolved, but was merely looking for an excuse to end Plaintiff's employment.  Plaintiff ignores, however, that Kerr delivered a decidedly negative review a year before, which included a

-13-

development plan, and also negotiated a school transfer for Plaintiff so he would have an opportunity for a fresh start.  The timing does not demonstrate that the performance problems identified by Kerr were pretextual.

Finally, Plaintiff contends that the parking-spot controversy demonstrates pretext.  In short, he argues that a female principal would not have been asked to give up her parking spot near the building to accommodate a pregnant teacher.  There is no evidence, however, suggesting that a principal who was a woman would not have been similarly asked to give up a parking spot close to the school to accommodate a teacher with temporary physical limitations.  Moreover, Plaintiff admitted that the custom at the school called for the principal to give up the spot if a teacher needed it for health reasons.

Because Defendant has identified a legitimate, nondiscriminatory reason for its decision to not renew Plaintiff's contract and Plaintiff has not demonstrated that the reason is pretextual, Plaintiff's discrimination claims will be dismissed with prejudice.  Importantly, regardless of whether a claim is analyzed through the lens of *McDonnell Douglas*, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *White*, 533 F.3d at 391–92 (citing *Burdine*, 450 U.S. at 253). There is no genuine dispute of material fact in this case as to whether Plaintiff can meet that burden. There is simply no evidence that Plaintiff's gender played any role in Kerr's recommendation and the board's decision not to renew his contract.

## IV.

Both PERA and the Taft-Hartley Act guarantee employees the right to join, organize, and assist labor unions, to bargain collectively through chosen representatives, and to engage in other

-14-

"concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157; Mich. Comp. Laws § 423.209. Both statutes also make it unlawful for employers to interfere with employees' rights to organize and collectively bargain. 29 U.S.C. § 158(a)(1); *Mich. Emp't Relations Comm. v. Reeths-Puffer Sch. Dist.*, 215 N.W.2d 672, 674 (Mich. 1974). Plaintiff contends that the board impermissibly considered his membership in a labor union and his participation in collective bargaining when making the decision not to renew his contract.[3]

Plaintiff's argument is based solely on a single paragraph from the minutes of the April 23, 2009 meeting where the board voted not to renew Plaintiff's contract. [Dkt. # 17-4]. During the course of her explanation for recommending nonrenewal of the contract—an explanation that ran for ten single-spaced pages in the meeting minutes—Kerr stated:

> On October 10th and 12th, I met with the USW (Admin) team to discuss negotiations. Mr. Gielda volunteered to be a representative for the administrative team. These negotiations were tenuous due to Mr. Gielda's own agenda. He insisted that he should be eligible for the 2007–08 increase and annuity payment. This created some hostility between the team, as well as they felt Mr. Gielda as well as I did that Mr. Gielda should not [be] eligible for a pay raise after only being on the job for two months. His salary and contract was adjusted in July when he began his employment with the district. He still held firm that he thought he should have had the raise, but the administrative team ignored his own agenda and voted to approve the new contract.

[Dkt. # 17-4 at 9].

No reasonable juror could conclude based on Kerr's comment that the board's decision to not renew Plaintiff's contract was based in any way on his membership in the union, his participation in collective bargaining, or his assertion of a right under the collective bargaining

---

[3] As with Plaintiff's Title VII and ELCRA claims, the PERA and Taft-Harley Act claims will be considered together because both statutes offer the same or very similar protections and neither party has identified a distinguishing characteristic that is applicable to this case.

agreement. *See N.L.R.B. v. City Disposal Sys., Inc.*, 465 U.S. 822, 829 (1984). Kerr's discussion focused largely on Plaintiff's lack of leadership and communication skills, his demonstrated inability to listen to co-workers and work collaboratively with them, and his poor interpersonal relationships with his colleagues. The discussion of his conduct during the collective bargaining process was meant to highlight those traits. Kerr never suggested that Plaintiff's employment should be ended for exercising the collective bargaining rights guaranteed by state and federal law.

Plaintiff participated in the collective bargaining process which ultimately resulted in a contract for the union's administration group. During that process, Plaintiff, according to Kerr, angered his colleagues—that is, his fellow union members—because he elevated his own interests above the interests of the group he was to represent. Kerr included the comment to demonstrate Plaintiff's apparent selfishness and inability to work within the school with teachers and other staff members. Accordingly, Plaintiff's PERA and Taft-Harley Act claims will also be dismissed.

## V.

Plaintiff also included a claim for violation of the Michigan "Administrator's Due Process Act" in his complaint. Michigan law requires that before a school administrator's contract is not renewed, the administrator must be provided an opportunity to meet with a majority of the board to discuss the reasons for the nonrenewal in an open meeting. Mich. Comp. Laws § 380.1229. Plaintiff was provided such an opportunity at the April 23, 2009 meeting, and has abandoned this claim in his response to Defendant's summary judgment motion.

Accordingly, it is **ORDERED** that Defendant's motion for summary judgment [Dkt. # 17] is **GRANTED**.

-16-

It is further **ORDERED** that Plaintiff's complaint is **DISMISSED WITH PREJUDICE**.


s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge


Dated: August 12, 2011

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on August 12, 2011.

s/Tracy A. Jacobs
TRACY A. JACOBS